UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 MAY -3 PM 1: 45

| | | |
|---|---|---|
| RICHARD HUNTINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number |
| vs. | ) | 00-C-3364-S |
| | ) | |
| I-20 PROPERTIES, a corporation, | ) | |
| ERVIN CONSTRUCTION | ) | |
| COMPANY, a corporation, ERVIN | ) | |
| EXCAVATING COMPANY, a | ) | |
| corporation, BILL ELLISON, an | ) | |
| individual, DON RAUGHTON, an | ) | |
| individual, | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED
MAY 3 2002

### MEMORANDUM OPINION GRANTING DEFENDANT I-20 PROPERTIES'S MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff Richard Huntington brings claims alleging that commercial real estate developer Defendant I-20 Properties, among others, is liable for injuries Plaintiff sustained in the course of his employ.[1] Now before the Court is Defendant's motion for

---

[1] Plaintiff also presses claims against Ervin Excavation, Ervin Construction, and Bruce Ervin. However, the Ervin Defendants do not join the instant motion for summary judgment. Therefore the Court will consider the motion for summary judgment with respect to I-20.

In his complaint, Plaintiff claimed that Ervin did not maintain worker's compensation insurance at the time of his injury, and states that, "as a result, Plaintiff claims damages against Ervin pursuant to the Alabama Employer's Liability Act, Code of Alabama § 25-6-1 et seq." See Plaintiff's Complaint, ¶10 (Doc. 1). However, the substance of employer liability related to

summary judgment on all claims. (Doc. 22). The parties have submitted evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. In addition, Defendant has filed a motion to strike certain portions of Plaintiff's deposition. (Doc. 27). After careful consideration of all relevant materials, the Court concludes that Defendant's motion for summary judgment is due to be GRANTED. The Court also concludes that Defendant's motion to strike is due to be GRANTED. The Court's reasoning follows.

## I. BACKGROUND

Defendant I-20 Properties ("I-20"), a commercial real estate development company, owned a parcel of land adjacent to Pell City, Alabama. I-20 sought to develop this piece of land into various business facilities, including a restaurant and a hotel. Sometime during the first half of 2000, Defendant Don Raughton, a shareholder in I-20, met with Defendant Bruce Ervin regarding the water and sewer installation work for the site.[2] The specifications for the

---

worker's compensation insurance carriage is not codified at § 25-6-1, *et seq.*, but rather at § 25-5-1, *et seq.* This latter section is, appropriately, titled the Workmen's Compensation Act.

Moreover, even if Plaintiff had referred to the correct statutory authority for his workmen's compensation claim, the Workmen's Compensation Act and the Employer's Liability Act are "mutually exclusive and cannot apply to the same set of facts." Veterans of Foreign Wars Post 7320 v. Sheffield, 398 So.2d 262, 263 (Ala. 1981).

The Court recognizes that "[s]uits brought by an employee against an employer for injuries sustained in the course of her employment are presumed to fall within the provisions of the Workmen's Compensation Act." Id. (citations omitted). In the instant case the parties have not disputed the applicability of the Employer's Liability Act. In addition, the Ervin Defendants are not moving for summary judgment. The Court will therefore examine Plaintiff's claim as having been brought under that Employer's Liability Act, and not under the Workmen's Compensation Act.

[2]Although not explicit from the parties' papers, Bruce Ervin appears to have been the president of both Ervin Construction and Ervin Excavation.

water and sewer work were established, and compliance therewith overseen, by Pell City. During the preliminary talks between I-20 and Ervin an agreement was reached with respect to the contract price for doing the water and sewer installation work. No representative of I-20 ever discussed any aspect of site-safety equipment, and I-20 claims to have had no expectations with respect to same.

After being retained by I-20 to perform the water and installation work on the site, Ervin hired Plaintiff to perform some of the trench-digging and pipe-laying duties attending the project. Plaintiff was based in California and had been performing similar work since 1989.[3]

As the construction work progressed, the trenches being dug became sufficiently deep that a device known as a "shield" should have been inserted. A shield provides support for the walls of a trench, protecting them from caving in. Therefore, when a trench is of a certain depth, the usage of a shield is essential if workers are to enter the trench.

Ervin routinely admonished his employees not to enter a trench lacking a shield, unless the walls of the trench are first "sloped down" as a precautionary measure. Prior to the insertion of a protective shield, however, Plaintiff entered the trench to perform some work. The trench subsequently collapsed, injuring Plaintiff.

The circumstances surrounding Plaintiff's entering the trench are disputed by the parties. Plaintiff alleges that he communicated the necessity of having a shield in place to Ervin prior to his climbing into the trench. Plaintiff claims that his concerns were ignored, and

---

[3]Plaintiff and Ervin were acquainted because they had been related by marriage.

that Ervin simply told Plaintiff to get into the trench so that the day's work would be complete and all the employees could go home for the day. Defendant contends that despite his awareness of the dangers engendered by a worker entering a deep trench without a shield, Plaintiff leapt into the trench voluntarily. One of Plaintiff's co-workers testified to having warned Plaintiff of the dangers of working in the unguarded trench – to which Plaintiff responded, "it'll be all right."

Plaintiff does not contest Defendant's assertion that neither of I-20's representatives (Raughton and Ellison) ever spoke with Huntington or any other of Ervin's employees. However, Plaintiff contends that I-20 exerted control over Ervin's ditch-digging and pipe-laying work. Plaintiff cites a lone piece of evidence for this assertion: that Raughton, while at the construction site, told Ervin that he wanted the shield to be installed. While Plaintiff did not actually hear this statement made by Raughton to Ervin, Plaintiff claims that Ervin proceeded to tell Plaintiff that Raughton harbored such a belief. Defendant contends that there is no evidence that I-20 ever exerted any control over the working conditions present at the site. Further, Defendant points out that this evidence consists of two out-of-court statements not subject to any exception or exemption from the general prohibition on hearsay.

## II. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine

issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for the motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996); see also Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), cert. denied sub. nom., 516 U.S. 817 (1995).

Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).

III. DISCUSSION

1. <u>Parties' Legal Relationships-Statutory Definitions</u>

The crux of this tort case is largely founded on the extension of legal duty between and among the parties. Plaintiff argues that I-20 was a general contractor deeply involved in the safety and overall work conditions at the work site. Plaintiff argues that I-20 therefore owed Plaintiff a duty to provide for safe working conditions – in this case, the provision of the trench shield. Defendant I-20 argues that it was merely an owner, not a general contractor, and exercised no control over the work conditions at the site. Defendant therefore argues that it owed Plaintiff no duty.[4]

Section 34-8-1(a), Ala. Code 1975, in pertinent part, defines a "general contractor" as "one who, for a fixed price, commission, fee or wage, undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation or demolition of any building . . . structure, site work . . . or project or any improvement" in the state. See <u>Central Alabama Home Health Services, Inc.</u>, 790 So. 2d 258, 261 (Ala. Civ. App. 2000). Section 34-8-1(c) defines a "subcontractor" as a "general contractor" who "performs work under contract to another general contractor."

I-20, as the owner of the site that was being developed at the time of Plaintiff's injury, was not engaged in any of the activities limned in the statute for any form of remuneration.

---

[4] The legal titles attaching to the parties are significant mainly because the parties have chosen to dispute and focus on the issue; however, saying that one party is a "general contractor," a "subcontractor," or an "owner" merely serves as an indication of the level of *control* exercised over the worker and the conditions that injured her. The Court will discuss this in greater detail <u>infra</u>.

It is clear that I-20 was an "owner" and that Ervin and the entities of which he was the director served as general contractors. Plaintiff, having been hired by Ervin to perform under a contract, was himself clearly a subcontractor.

2. Plaintiff's Evidence that I-20 is a "General Contractor"

Plaintiff argues that Defendant I-20 was not an "owner," but was a general contractor that exercised control over its "subcontractors" Ervin and Plaintiff. The only evidence cited by Plaintiff for this proposition is that Plaintiff was told by Ervin that Raughton wanted a shield put in place in the trench.

> A. I guess Don Raughton would have directed some of it, because there was a time where him and Bruce [Ervin] had talked and then I was told that after lunch we needed to go get the shield and install the shield because Don wanted it installed.
> Q. Don wanted the shield installed?
> A.. Yes, sir.
> ***
> Q. Did you see him say any words or did you just see him talking to somebody?
> A. See him talking.
> Q. You didn't hear him say anything?
> A. No.
> Q. So how do you know what he said?
> A. Because Bruce Ervin came up after that, and he said that we need to get the shield and install the shield because Don wants it installed, he wants us to use the shield.

Assuming that Ervin actually said that Raughton "told him" that he was to put in the shield, the evidence consists of two out-of-court statements. In order for the statement of Raughton to Ervin to be admissible, both statements must fall under either an exception to or an exemption from the general rule proscribing the introduction of hearsay testimony. See Federal Rule of

Evidence 805.

Raughton's statement to Ervin is not hearsay. First, it is doubtful that if it were the only "level" of hearsay (i.e. if Ervin were testifying directly as to what Raughton told him) that it would be being offered for the truth of the matter asserted. However, the statement falls under an explicit exemption from the hearsay prohibition under Eleventh Circuit case law. In Scofi v. McKeon Construction Co., 666 F.2d 170 (5th Cir. 1982),[5] an independent contractor's estate brought a wrongful death action against a commercial real estate developer based on the collapse of a trench. Immediately after the collapse, the defendant's project manager arrived at the site and had a short conversation with the chief subcontractor. The project manager testified that the subcontractor told him not to interfere in the safety of the work being done at the site.[6] The district court had found that the statements made by the chief subcontractor were not hearsay, as they fell under the aegis of FRE 801(d)(2)(D) as being a statement made by a the party's agent concerning a matter within the scope of the declarant's agency. The Fifth Circuit affirmed, finding that the testimony as to the statements was properly admitted against the subcontractor/third party defendant. The Circuit Court based its conclusion on the fact that the subcontractor's statements regarding the division of responsibility at the site were within the

---

[5] Decisions by the former Fifth Circuit issued before October 1, 1981 are binding as precedent in the Eleventh Circuit. See Bonner v. City of Prichard, Ala., 661 F. 2d 1206, 1207 (11th Cir. 1981) (en banc). This case was a Former Fifth Circuit case and is therefore binding on this Court. See Section 9(1) of Public Law 96-452 (October 14, 1980).

[6] The defendant, McKeon, had filed suit against the subcontractor for indemnification. McKeon's position at trial was that it did not exercise control over the safety of the work being done at the site.

scope of the subcontractor's authority.

In the instant case, the first level of potential hearsay was made by Don Raughton, one of the two shareholders of Defendant I-20. As one of two chief shareholders in I-20, it was within the scope of Raughton's authority to communicate the I-20's position on workplace safety – Raughton's statement properly could be understood to represent the position of I-20. Therefore, the first statement is admissible against I-20.

The second statement, Ervin telling Plaintiff that Raughton ordered him to install a shield, is being offered for the truth of the matter asserted – namely that such a particular statement was uttered to Ervin by Raughton. The matter being asserted is not that Raughton wanted the shield put in place, but that a certain statement was made. Ervin's statement, "Raughton told me that he wants the shield installed," only has probative value if Raughton actually told Ervin to install the shield. What Plaintiff was told and what he reasonably could have believed based on such statement are of no legal significance in this case. What is important is whether I-20 attempted to reserve or wrest control over the work being done at the site from Ervin. In this instance the statement made by Ervin to Plaintiff falls under the literal definition of hearsay as defined by Federal Rules of Evidence 801(a) - (c).

Plaintiff argues that Ervin's statement to Plaintiff is not hearsay because it was a statement by a person authorized by I-20 to make such statement,[7] and/or was a statement made

---

[7]Under FRE 801(d)(2)(C), a statement is not hearsay if "the statement is offered against a party and is . . .a statement by a person authorized by [the party] to make a statement concerning the subject."

by Defendant's agent concerning a matter within the scope of his agency. In order for either of the exemptions argued by Plaintiff to apply, "the proffering party [is required] to lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment." Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1566 (11th Cir. 1991) (citations omitted). The *Wilkinson* court further noted that "[m]erely showing that a statement was made by one who is identified generally as an agent or employee of the party, without some further proof as to the extent of his authority to make the statement (for purposes of subsection (C)) or as to the scope of his employment (for purposes of subsection (D)), establishes neither." Id. (quoting White Industries v. Cessna Aircraft Co., 611 F. Supp. 1049, 1064 (D. Mo. 1985) (citation omitted)).

Plaintiff argues that Ervin was an agent of I-20. Federal Rule of Evidence 801(d)(2)(D) does not define the term "agency." Under Alabama law, whether an individual is an "independent contractor" or an "employee" of a party is determined by whether the party had "reserved a right of control over the means and agencies by which the work was done or the result produced, not the actual exercise of such control." Morrison v. Academy Life Ins. Co., 567 So. 2d 1309, 1311 (Ala. 1990). The latter term, "employee," in this context implies the existence of a "master-servant" relationship and is the equivalent of an agent-principal relationship. See, e.g., Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 65 (1st Cir. 2002) (citing Merrick v. Farmer's Ins. Group, 892 F.2d 1434, 1440 (9th Cir. 1990)). The only proof offered to establish the reservation of control over Ervin by I-20 is the statement made by Raughton to Ervin during his visit to the site. Thus, Plaintiff seeks to establish the admissibility

of the statement by offering the statement itself. This Plaintiff obviously cannot do. Plaintiff fails to establish an adequate foundation for the admissibility of the statements. Ervin's out-of-court statement to Plaintiff is hearsay, and neither of the two exemptions offered by Plaintiff applies. Therefore, neither Raughton's statement to Ervin nor Ervin's statement to Plaintiff is admissible. Defendant's motion to strike is therefore due to be granted.

3. <u>General Rule–No Liability of an Owner to a Subcontractor for Obvious Dangers</u>

Although the Alabama courts have employed slightly different analyses, it appears that the Supreme Court most clearly (and recently) defined the duty owed by an owner of a premises to an employee of an independent contractor killed by a cave-in of a trench: "The owner of [a] premise is not responsible to an independent contractor for injuries from defects or dangers which the contractor knows of, or ought to know. However, if the defect is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor, and if does not do this he is liable for result of injury. . . .The entire basis for an invitor's liability rests upon his superior knowledge of the danger which causes the invitee's injuries. Therefore, if that superior knowledge is lacking, as when the danger is obvious, the invitor cannot be held liable." <u>Pope v. City of Talladega</u>, 602 So. 2d 890, 891-92 (Ala. 1992) (citations and quotations omitted).

I-20 was the "owner" of the site at which Plaintiff was injured. I-20 could be held liable to Plaintiff in the instant case if the possibility of a cave-in from unreinforced walls of a dirt trench were a latent danger. However, the parties in this case have argued just the opposite – that the danger of such an occurrence was widely known to all in the construction industry,

including Plaintiff and Ervin. In any event, I-20's duty as an owner surely does not extend to Plaintiff for the injuries sustained under the rule reiterated in *Pope*.

Two exceptions to this general rule of non-liability are (1) if the owner (or general contractor) retains *control* over the independent contractor's work performance, or (2) if the work being performed is "inherently dangerous." Pope, 602 So. 2d at 892-93. If an owner retains sufficient control over the subcontractor's work, she may be liable for injuries sustained to a subcontractor's employee. Thomas v. Pepper Southern Construction Inc., 585 So. 2d 882, 884 (Ala. 1991) (citations omitted).

As to the "exercise of control" exception to the rule of non-liability, the Courts have discussed at length the degree and kind of control that would have to be exercised in order to extend duty and therefore liability. The *Thomas* Court stated: "[c]ontrol is not established if the asserted employer retains the right to supervise the [subcontractor employee] merely to determine if the [employee] performs in conformity with the contract." Thomas, 585 So. 2d at 884 (citations omitted). In other words, having representatives on site to monitor work progress does not import a duty of safety inspection upon the defendant. As discussed above, the only evidence that Plaintiff can marshal in order to establish that Defendant I-20 exercised control over the work being performed by Plaintiff sufficient to import liability, is a single statement that amounts to hearsay. As Defendant's motion to strike such evidence is being granted by the court, and it is the only evidence proffered by Plaintiff, the "control" exception to the general rule of non-liability is unavailable to Plaintiff with respect to Defendant I-20.

As to the "inherently dangerous" exception, the Supreme Court in *Pope* spoke to this

issue. The *Pope* Court explained that the excavation work that resulted in the wall collapse is not "intrinsically dangerous" because the exercise of due care (or of OSHA-level care) would have vitiated the risk of collapse. Thus, the crux of this exception is whether the danger *could* have been mitigated – in trench collapse cases where a lack of a shield, or of sloping or shoring, caused the collapse, the danger is not "inherent." See Pope, 602 So. 2d at 893. Therefore, the Court concludes that the "inherently dangerous" exception does not apply in the instant case.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that Defendant I-20's motion for summary judgment (Doc. 22) is due to be GRANTED with respect to all claims advanced by Plaintiff. The Court finds no genuine issue of material and triable fact as to such claims and that Defendant is entitled to judgment as a matter of law. In addition, the Court finds that Defendant's motion to strike (Doc. 27) is due to be GRANTED.

These conclusions shall be embodied in a separate Order.

Done this 3rd day of May, 2002.

_____
Chief United States District Judge
U.W. Clemon